[No. 3386.  Decided May 14, 1900.]

WILLIAM S. SIBSON *et al., Appellants,* v. HAMILTON AND ROURKE COMPANY, *Respondent.*

PRINCIPAL AND AGENT—LIABILITY FOR MISMANAGEMENT.

Where the absolute control of the business and property of a debtor corporation passes by agreement into the hands of a mortgagee, and an officer and stockholder in the debtor corporation is made manager under the direction of the mortgagee, for the purpose of continuing the business and paying off the corporate indebtedness, such stockholder becomes the agent of the mortgagee, and, for any mismanagement of the business on his part, resulting in loss, the mortgagee, and not the corporation, is liable.

EVIDENCE—VARIATION OF WRITTEN AGREEMENT BY PAROL.

Parol testimony is not admissible for the purpose of modifying a written agreement, by showing that there was a tacit understanding between the parties upon a certain matter, which one of them refused to have incorporated therein for the reason that he was of the opinion that it might interfere with his legal rights.

Appeal from Superior Court, Whitman County.—Hon. WILLIAM McDONALD, Judge.  Reversed.

*Williams, Wood & Linthicum* and *H. W. Canfield,* for appellants.

*Wyman & Neill* and *Douglas W. Bailey,* for respondent.

The opinion of the court was delivered by

DUNBAR, J.—The following is a very brief and condensed statement of the material facts in this case:  Some time prior to 1894 Charles Hamilton and Thomas F. Rourke, residents of Pendleton, Oregon, had been conducting a wheat warehouse business in a partnership capacity under the firm name of Hamilton & Rourke.  In connection with the warehouse business they also bought

wheat of the farmers and sold to the exporters. In February, 1896, the partnership was dissolved and a corporation was formed called the Hamilton & Rourke Company. The capital stock of this company was $150,000, divided into fifteen hundred shares. Of these shares Rourke and Hamilton each took seven hundred and forty-seven, D. W. Bailey three, G. A. Hartman two, and J. W. Furnish one, —Rourke and Hamilton, as it will be seen, owning all but six shares,—and, while Bailey, Hartman, and Furnish acted as directors with Rourke and Hamilton, Rourke and Hamilton really controlled the corporation and managed the business. The corporation, during all the time it was doing business, dealt largely with the appellants Sibson and Kerr. The partnership had become indebted during its existence, its debts were assumed by the corporation, and, on May 18, 1894, it gave to A. L. Mills of the Security Savings & Trust Company of Portland, Oregon, as trustee, a first mortgage on all its working plant and appurtenances, to secure the creditors Ames & Harris and the Omaha Bag Company. After that the appellants supplied the company with sacks, and made advances to it on the shipping receipts of wheat consigned to them by the company. A running account was kept between the appellants and the defendant company until the corporation owed the appellants about $50,000, and on December 13, 1895, to secure $30,000 of this amount, the company gave a second mortgage on all its warehouses, appurtenances, and assets. The remainder of the indebtedness, $20,000, for reasons which it is not necessary to comment upon, was left unsecured. In the spring of 1896, the company being hopelessly in debt and being pressed for the payment of the first mortgage, at its suggestion Sibson & Kerr bought up the first mortgage and undertook to finance the company, agreeing to withhold any proceedings against

it for at least a year, and thereafter to proceed only on six
months' notice, and to continue Rourke and Hamilton in
the conduct of the business, provided they were put in pos-
session and control of the property as mortgagees in posses-
sion.   In accordance with this agreement, in April, 1896,
Sibson & Kerr bought for themselves one-half, and in trust
for the Portland Flouring Mills Company (T. B. Wilcox,
manager), one-half, the first or Mills mortgage, for its
then face value, the amount actually paid for the mort-
gage being $24,500.   The arrangement above noted was
entered into in accordance with a resolution adopted April
1, 1896, by the defendant company, which, with some
amendments and changes which we will hereafter note,
was accepted by appellants Sibson & Kerr and finally
ratified by the defendant company April 21, 1896.
Rourke was then appointed manager of the business at a
salary of $300 per month.   Nothing of importance inter-
vened until the 21st of the following July, when a new
corporation was formed called the Hamilton & Rourke
Warehouse System, which for convenience we will here-
after denominate the "System."   The shares of this new
corporation were all owned by Sibson & Kerr and T. B.
Wilcox, who represented the Portland Flouring Mills
Company, in proportion to the amount owed to these con-
cerns by the Hamilton & Rourke Company, and its stock
was paid by selling to the corporation the second mortgage.
Of this new corporation Sibson was president, Kerr vice-
president, and T. Brooke White, an employee of Sibson
& Kerr, and T. B. Wilcox were its directors.   After the
organization of the System, Rourke was continued as man-
ager.   The System continued to do business until Feb-
ruary 27, 1898, when Rourke, in response to a request of
Sibson & Kerr for statement of the standing of the con-
cern, furnished the same, showing that it was hopelessly

insolvent, and at the same time tendered his resignation as manager. The remainder of the history, as is aptly said in appellants' brief, "has simply to do with clearing up the wreckage," and its recital in detail is not material to the investigation of the questions at issue. It may be said generally, however, to preserve chronological order, that, after a floundering existence until the 19th day of July, 1898, the System was abandoned, and its stockholders caused to be organized another corporation, viz., the Western Warehouse Company. The mortgaged property is now in possession of that corporation, and is being operated and conducted by it. After the disintegration of the System, the appellants, Sibson & Kerr, brought this action to foreclose the second mortgage mentioned above for $30,000, with interest, together with money advanced, amounting in all to $106,638.40. Judgment for this amount is asked jointly and severally against the Hamilton & Rourke Company and the Hamilton & Rourke Warehouse System, together with general relief.

The complaint, of course, is based upon the theory and the alleged fact that the manager, Rourke, was the agent of the Hamilton & Rourke Company. This allegation is denied by the answer, which avers that Rourke was appointed manager and conducted the System as the agent of the appellants only, and that it, the Hamilton & Rourke Company, did not at any time have any management or control of the business of the System; and it denies all indebtedness to the appellants. For an affirmative defense it alleges that the appellants violated their trust, as expressed in their written agreement, by wrongfully and without authority turning over the mortgaged property to the System, and, in short, it is alleged that by reason of the gross mismanagement of the System by Sibson & Kerr, and by the wrongful use of the System for their benefit,

defendants were deprived of the profits of the business; that the plaintiffs made fraudulent charges against the System and overcharges for services rendered; that, if an accounting had been made by the appellants and the business had been properly conducted by them, the original indebtedness would have been secured in favor of defendants; and they pray for a cancellation and satisfaction of the mortgages, for a restoration of the possession of the property mortgaged, for a general accounting, for judgment for such amount as may be found due them on such accounting, and for general relief.

The cause was referred to S. J. Chadwick to take the testimony and make findings of fact and conclusions of law. After a long and tedious trial, involving several months' time, the referee reported voluminous findings of fact, which it would not be profitable or practicable to review in detail, but he found substantially that the appellants were conducting the business of the System, and were responsible for it, and that Rourke was the agent of the appellants, and not of respondent, the Hamilton & Rourke Company. As conclusions of law from all the various and manifold findings of fact, the referee found: 1st, that the appellants were entitled to judgment against the defendants, the Hamilton & Rourke Company and the Hamilton & Rourke Warehouse System, for the sum of $30,000, with interest from the 13th day of December, 1895, at the rate of eight per cent. per annum; for the sum of $20,000, with interest thereon from July 21, 1896, at the rate of eight per cent. per annum; and for the sum of $91,776.58, money advanced as found in the findings of fact (from which last mentioned sums, however, should be deducted the sum of $95,820.66, due the Hamilton & Rourke Company, as found in the findings of fact) ; 2d, that the court should decree a sale of the mortgaged premises in Whit-

man county, Washington; 3d, that the proceeds of such
sale should be applied, after the payment of the expenses
thereof, (1) to the payment of said mortgaged indebted-
ness, together with the sum of $1,500 attorney's fees;
(2) to the payment of the balance due plaintiffs; and the
surplus, if any, should be paid over to the defendant, the
Hamilton & Rourke Company; 4th, that defendants, J.
W. Furnish and C. W. Brownfield, should have judgment
against plaintiffs for their costs herein expended. Both
plaintiffs and defendants excepted to the report of the
referee, and, upon a trial by the court, the report of the
referee was reversed, and the court, as conclusions of law,
found that the mortgage indebtedness alleged in plaintiffs'
complaint was fully paid and satisfied; that the defendant
company was entitled to a decree canceling and discharg-
ing all of said mortgages of record; and that the defendant
company was entitled to a judgment directing the imme-
diate return of the property described in plaintiffs' com-
plaint, and to a judgment for the sum of $46,570.15; and
a decree was entered in accordance with such conclusions.

From this synopsis it will be apparent that the first
question to be determined is, who was in control of and
responsible for the management of the System? or, in
other words, was Rourke the agent of the appellants or of
the respondent company? If of the company, the solution
is simple,—the appellants would be entitled to judgment
for the original indebtedness and for advances made since.
But if he was the agent of Sibson & Kerr, an accounting
becomes necessary. The determination of this question
involves no contested legal principles. Many cases are
cited by both appellants and respondent, but we do not find
it necessary to discuss them. The cases elucidate general
principles, and the principles announced are well settled.
Our duty here is to make an application of the facts to
the conceded law; and, applying the facts of this case to

the law as we understand it, we are forced to the conclusion that Rourke was the agent of Sibson & Kerr, and that, under the terms of the agreement, Sibson & Kerr were in control of the System and responsible for its management. That being true, having taken possession of the property and business of the respondent company, they must be responsible to the said company for any losses it has sustained by their mismanagement of such business. The agreement upon which this business was turned over to Sibson & Kerr, and which was the basis of the organization of the System, is too lengthy to be reproduced here, but all through it is evidence of the fact that Sibson & Kerr were to be clothed with absolute authority and control. For instance, after reciting the history of prior proceedings, it provides as follows:

" Said Hamilton & Rourke Company agrees to put said Sibson & Kerr, or whoever they may designate, in full possession and control of all the warehouses, elevators, platforms and appurtenances. . . . The said Sibson & Kerr or their assigns are to take and retain possession of said properties and each of them as mortgagees and manage and operate said properties and all of the warehouses and elevator business of said Hamilton & Rourke Company as mortgagees in possession, with complete and absolute authority in all respects and according to their own judgment and discretion and subject only to the following condition, that after paying all of the current expenses, including a reasonable compensation to said Sibson & Kerr for their management and operation of said properties," etc.   (Here follows an agreement in relation to application of the profits.)

It would be difficult for an agreement to clothe a person with authority, responsibility, and absolute control if this agreement does not clothe Sibson & Kerr with an absolute control over this business. The grant of power is clear and manifest, and the language employed is plain,

specific, and not susceptible of construction, for it must necessarily follow that control of the property described carries with it the control of the business carried on through the medium of the property. And, if this conclusion did not necessarily follow, it is made certain by the further provision for the application of the proceeds of the business by Sibson & Kerr, and especially by the third clause of such conditions, which is as follows:

"To hold in trust and pay over to the Hamilton & Rourke Company any surplus arising out of the operation of said business after all the foregoing charges and debts shall have been paid, and to render an annual account to said Hamilton & Rourke Company of their management and conduct of said business showing the expenditures, receipts, liabilities and balances."

This was most unfortunate language for Sibson & Kerr to subscribe to if they did not intend to be responsible for the conduct and management of the business. The following significant clause was incorporated in the agreement:

"Any losses accruing from the regular and legitimate management of said business shall be chargeable to the Hamilton & Rourke Company."

The only logical inference is that losses from the illegitimate management of the business should be borne by Sibson & Kerr, and Sibson & Kerr would scarcely subscribe to a responsibility for illegitimate and irregular management unless they could absolutely control the management, and Hamilton and Rourke could not escape such responsibility if appellants' theory of their position could be maintained. The court will not presume that this provision of the agreement did not mean anything, and, if we attribute any meaning to it at all, it relieves the respondent company from the responsibility sought by the appellants to be placed upon it. Many other provisions of the agreement are equally conclusive. As still further show-

ing the tenacious purpose of the appellants to absolutely control the business and keep its management free from the power of the respondent company and from Rourke, it will be noted that on the 6th of April, 1896, the respondent company passed a resolution agreeing to turn its property over to the appellants, providing they would agree to employ its secretary, T. F. Rourke, as manager of the new business. The appellants refused to accept the property and the management of the business on such terms, and afterwards, on April 8th, the respondent, at a meeting of the directors, adopted a resolution with the objectionable feature in regard to the employment of Rourke eliminated, and agreeing to give appellants full possession and control of all its property with complete and absolute power of management. The trust agreement was duly executed in conformity with such resolution, and, on the 21st of April, after the resolution had been ratified and spread upon the corporate minutes of the respondent, the appellants, by transfer from the respondent, took full possession and control of the property and of the business. But, even if it could possibly be thought that this agreement was susceptible of construction, one of the most common aids to construction is the manifest interpretation placed upon the agreement or contract by the parties thereto, as shown by their subsequent actions in relation to, and in their treatment of, the contract,—as shown in this case by the assumption of authority on the part of the appellants on the one hand, and the acquiescence in such acts of authority by the respondent on the other hand. As soon as the appellants had assumed control, they indited the following letter to Rourke:

April 21, 1896.

" Thomas F. Rourke, Esq.:

Possession of the business theretofore conducted by the Hamilton & Rourke Company having been this day trans-

ferred to us in accordance with the resolution and agreement duly passed and executed under the terms of which we are given full and absolute control of all the warehouses, etc., to operate the same as mortgagees in possession, and we by our agent and representative having taken and assumed such possession, you are now appointed as manager of the business for us at a salary of three hundred dollars per month."

We have not overlooked the testimony in relation to an alleged private understanding that Rourke should be the manager in any event, but do not think that such testimony, including testimony of Mr. Sibson (pages 1600 and 2239 to 2242 of the statement of facts), where he undertakes to make a distinction between legal powers and tacit understandings, in any way tends to show want of control or responsibility or trust power on the part of the appellants. Indeed, it rather accentuates the determination of the appellants to maintain undivided and absolute control of the business. If such tacit understanding with Rourke as is undertaken to be proven could be established, it could not possibly bind the company under the testimony in this case, even if it were competent as a legal proposition to attempt to alter the terms of a written instrument by parol; and whatever exceptions or modifications there may be to the general rule that the written agreement which parties enter into is presumed to express the ultimate conclusion of the parties, and to extinguish all other parol understandings, prior or contemporaneous, there is no authority in law which will warrant the attempt made in this case by the appellants to engraft upon the written agreement by parol testimony a controlling feature, which they admit they refused to have incorporated into the written agreement because they thought it would interfere with their legal rights. An excerpt from the testimony of Mr. Sibson (on page 2242) explains his theory of the tacit

understanding of the powers of Mr. Rourke, of which he
was then testifying:

"Q.    (Referee)    As I understand this thing, Mr. Sib-
son, it is like this:    The contract says the management
shall be with you people, the mortgagees.

A.    With us or our assigns.

Q.    Yes; but you have said there was a tacit under-
standing that Mr. Rourke should be the manager?

A.    Yes.

Q.    And that Mr. Hamilton had notice and knowledge
of these things, and practically, in effect, that it was the
Hamilton & Rourke Co.

A.    · That is what I mean.

Q.    Now, Mr. Wyman's question, as I understand it,
is to this effect:    When was that tacit understanding had
with reference to the written agreement?

A.    The tacit understanding was had in the negotia-
tions leading up to the contract.

Q.    (Mr. Wyman)    What I want to get at is, when
was it understood, or when was it agreed, that the person
who occupied the position of manager of the System,
to-wit, during the· time in these pleadings, Mr. Rourke,
that that person should be responsible for its management,
that Mr. Rourke should be responsible for its management
in a different sense or degree than Mr. Noonan is at this
time?

A.    There was no special agreement on that subject,
because it spoke for itself.

Q.    Well, whether I was to understand there was an
agreement of that sort, or whether it simply resulted from
the conditions as we find them in the record; whether,
irrespective of the oral understanding or agreement, there
was any writing?

A.    No, sir; it was understood that instead of foreclos-
ing these mortgages at that time, that they would give us
peaceable possession as mortgagees in possession; that we
or our assigns could run the business.    That was the legal
status of it.    Then there was the understanding between
Mr.· Rourke and the directors of the Hamilton & Rourke

Company, so far as that goes, that Mr. Rourke should be that manager.

Q. There was. such an understanding as that, was there?

A. Why, of course, it spoke for itself in the *pro forma* agreement which they drew up; and I think it speaks for itself in the resolution of the Hamilton-Rourke Warehouse System appointing Mr. Rourke as manager. That was in conformity with the general understanding. There was no particular writing about it, because we could not—supposed we could not—qualify the position we were in, legally, by having another contract on the outside; but that was the understanding. We had to maintain our legal right."

The resolution spoken of was the resolution first submitted, which provided for the appointment of Rourke as manager as one of the conditions of turning over the property to appellants, which condition was objected to by the appellants, and at their instance eliminated by the respondent. The logic of Mr. Sibson's testimony is that the understanding which culminated in the resolution was rejected, and not incorporated into the written agreement, because it would prevent absolute control and responsibility on the part of the appellants, but that it can now be proven to avoid control and responsibility on the part of the appellants. Further comment on the position would seem to be unnecessary.

Another circumstance showing the interpretation placed upon this agreement by the appellants, so far as Rourke's responsibility is concerned, was the appointment of White as a sort of overseer or vice-principal. Rourke's checks were not even honored unless they were indorsed or countersigned by White, and it is evident that White was the trusted and confidential agent of the appellants, and that Rourke's acts were under his surveillance, at least until

SIBSON v. HAMILTON & ROURKE CO.        461

May, 1900.]     Opinion of the Court — DUNBAR, J.

Rourke moved to Portland, after which Sibson personally
gave him more minute directions.

But it is useless to further specify.  The whole record
is convincing that Rourke was nothing more than manager
of the System, appointed by the officers of the System,
controlled by them, the tenure of his employment depend-
ing upon their will, and, in every way, their agent.  This
being true, his mismanagement was in legal effect their
mismanagement, for which they are responsible.  This
view of the case has made it incumbent upon the court to
investigate the management of the business; and, in view
of the fact that the findings and conclusions of the court
differ so widely from the findings and conclusions of the
referee, we have examined in detail the record, consisting
of many thousand pages.  It would be impracticable and
useless to undertake in this opinion to give expression to
an analysis of the voluminous testimony.  It is sufficient
to say that an investigation thereof convinces us that sub-
stantial justice was done by the judgment of the referee.
In one instance, however, we think he made a mistake in
calculation.  In finding number 21 the total amount
claimed by appellants and the Portland Flouring Mills
Company is stated to be $89,537.99, but his segregation
of this amount is as follows: Sibson & Kerr, $54,902.62;
Portland Flouring Mills Co., $37,073.96.  This would
make a total of $91,976.58, which is $2,438.59 too much,
as the Portland Flouring Mills Co. account, as shown by
its own testimony, is $34,635.37, which, added to the
Sibson & Kerr account of $54,902.62, makes $89,537.99.
This error is carried forward in finding number 30, and is
included in the final calculation.  However, in the con-
clusions of law which follow the findings of fact, the sum
total stated is $91,776.58 instead of $91,976.58, as set
forth in the findings of fact, thus in effect correcting the

miscalculation in the findings of fact to the extent of $200.

We have not overlooked the other claims of error made by the respondents and appellants, both as to calculations made by the referee and his view of the law and facts in the case, but we do not think they are justified by the whole testimony.

The judgment will be reversed, with instructions to enter judgment in accordance with the report of the referee, after deducting the amount of $2,238.59, the error just above noticed.

GORDON, C. J., and FULLERTON and REAVIS, JJ., concur.